# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

| | | |
|---|---|---|
| **WENDY L. WOOD** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:07CV00073 |
| | ) | |
| v. | ) | **OPINION** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | By: James P. Jones |
| **COMMISSIONER OF** | ) | Chief United States District Judge |
| **SOCIAL SECURITY,** | ) | |
| | ) | |
| Defendant. | ) | |

*John M. Lamie, Browning, Lamie, & Gifford, P.C, Lebanon, Virginia, for Plaintiff; Andrew C. Lynch, Special Assistant United States Attorney, Office of the General Counsel, Social Security Administration, Philadelphia, Pennsylvania, for Defendant.*

In this social security case, I affirm the final decision of the Commissioner.

I

Wendy L. Wood filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for supplemental security income ("SSI") benefits under title XVI of the Social Security Act ("Act"), 42 U.S.C.A. §§ 1381-1383(f) (West 2003 & Supp. 2008). Jurisdiction of this court exists pursuant to 42 U.S.C.A. § 405(g).

My review is limited to a determination as to whether there is substantial evidence to support the Commissioner's final decision. If substantial evidence exists, this court's "inquiry must terminate," and the final decision of the Commissioner must be affirmed. *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Id.*

The plaintiff initially applied for SSI benefits on August 2, 2004, alleging disability beginning December 1, 2000, due to Crohn's disease. (R. at 13.) This claim was denied initially on November 12, 2004, and not further pursued. (*Id.*)

On June 22, 2005, the claimant filed her current application for SSI. (*Id.*) The claim was denied initially on August 23, 2005, and upon reconsideration on October 17, 2005. (*Id.*)

The plaintiff filed a request for a hearing October 28, 2005. (*Id.*) She received a hearing before an administrative law judge ("ALJ") on October 2, 2006. (R. at 13-22.) The plaintiff, who was represented by counsel, testified at the hearing. Thomas E. Schacht, M.D., a licensed clinical psychologist and medical expert, and Robert S. Spangler, a vocational expert ("VE"), also appeared and testified at the hearing. (*Id.*)

By decision dated November 30, 2006, the ALJ found that the plaintiff was not disabled within the meaning of the Act. (R. at 21-22.)

The plaintiff then filed a request for review with the Social Security Administration's Appeals Council on December 14, 2006. (R. at 9.) By notice dated August 3, 2007, the Appeals Council denied review, and the ALJ's opinion constitutes the final decision of the Commissioner. (R. at 8.)

The parties have filed cross motions for summary judgment and have briefed the issues. The case is now ripe for decision.

II

The summary judgement record reveals the following facts. The plaintiff was thirty-three years old at the time of the ALJ's decision, making her a younger individual under the Commissioner's regulations. *See* 20 C.F.R. § 416.963(c) (2007). She has a high school education and job training as a nurse's assistant. Her past work experience includes owning an ice cream business and being employed as a cashier, a sewer, and a substitute teacher. (R. at 58, 62-63.)

The plaintiff has a history of Crohn's disease and gastritis. Michael Sullivan, M.D., treated the plaintiff from June 2003 until March 2005. (R. at 122, 127.) The plaintiff was hospitalized at Holston Valley Hospital on May 5, 2003 for pancreatitis.

The plaintiff was then seen by Dr. Sullivan on June 4, 2003, for a follow up regarding pancreatitis. On this date no medications were prescribed and the patient was instructed to call back if her symptoms resumed, no procedures were performed until past medical records could be obtained. (R. at 166.) On June 26, the plaintiff returned to Dr. Sullivan for a second time and stated that she was "feeling great." (R. at 167.)

The plaintiff came to Dr. Sullivan on September 18, 2003, for a follow-up, complaining of some diarrhea but no pain or nausea. (R. at 162.) On October 31, 2003, the plaintiff came to Dr. Sullivan with pancreatitis, possible aggravation of her Crohn's disease, blood in the stool, mid-abdominal pain, nausea, and vomiting. (R. at 161.) The plaintiff noted to Dr. Sullivan that the "pain was a 10 on a 1 to 10 pain scale." (R. at 158.) On this date she received 20 milligrams of Nubain and Phenergan for nausea and Loritab for the pain, was placed on clear liquids for seventy-two hours, and was instructed to return on Monday. The plaintiff returned November 3, 2003, and was doing better, denying any pain. (R. at 155.) She then returned on November 10, 2003, when she was scheduled for a colonoscopy and treated for her Crohn's disease. (R. at 153.) Upon receiving results from the colonoscopy the plaintiff was informed that Dr. Sullivan would consider placing her on medication for Crohn's disease. (*Id.*)

- 4 -

On November 25, 2003, the plaintiff returned for a colonoscopy "to check the lower G.I. tract for Crohn's." (R. at 148.) Up until this point Dr. Sullivan noted the plaintiffs history of Crohn's symptoms but did not "have any documentation." (*Id*.) In a summary of the findings, Dr. Sullivan notes the plaintiff's internal hemorrhoids, a redundant colon, pain upon motion of the scope used in the test, and an otherwise normal examination to the cecum. (R. at 149.) No actual documentation of Crohn's disease was found and an endoscopy and enteroclysis of the small bowel were performed. Dr. Sullivan found inflamation of the first portion of the small intestine with an ulcer probably secondary to Crohn's disease, and chronic gastritis. Steroids would be prescribed if the patient still has symptoms consistent with Chron's disease after the findings of the enteroclysis. (R. at 147.) The enteroclysis did reveal coarsening and an accumulation of fluids "most likely representing some degree of mucosal inflammation, most likely from Crohn's disease." (R. at 122.)

On January 12, 2004, the plaintiff returned to Dr. Sullivan's office with the complaint of hemorrhoids. Some rectal bleeding and pain were mentioned by the plaintiff, at this point it was noted by Dr. Sullivan that the plaintiff had recently been placed on and finished a round of medication for her symptoms of Crohn's disease. (R. at 141-142.) Some abnormalities were found probably secondary to her Crohn's disease. Labs had been ordered but the plaintiff called November 12, 2003, saying

that she could not afford these procedures because they cost $250. She, however, would have a pregnancy test so that she could begin the medication for her symptoms of Crohn's disease. (R. at 145.) When the plaintiff returned for a follow up on January 22, 2004, lab results revealed a negative pregnancy test, inflammation, and changes due to Crohn's disease. (R. at 140.) A cycle of medications was begun to help with these symptoms and changes due to Crohn's disease. (*Id*.) On February 5, 2004, the plaintiff returned for a follow up appointment. She had discontinued one of the medications because of some side-effects, but all in all she was responding well to the medication. (R. at 139.)

On August 17, 2004, the plaintiff again visited Dr. Sullivan's office for follow-up and was complaining of a flare up of her Crohn's disease. Prednisone injections were given, and it was noted that the plaintiff could be a possible candidate for Remicade, a type of treatment given for Crohn's disease intravenously in monthly intervals. The plaintiff stated, however, that she feared she could not afford it because she was going to lose her insurance beginning September 1. (R. at 134.)

On March 17, 2005, the plaintiff returned for a visit to Dr. Sullivan. (R. at 126.) This visit was simply a follow-up for her Crohn's disease and for refills of the plaintiff's prescriptions. (*Id*.) At this visit the plaintiff seemed to be doing well and

she admitted that "the only time that she seems to have a little bit of a flare with her Crohn's disease is around the time of her menses." (*Id.*)

On August 25, 2005, the plaintiff saw Sharai K. Narayanan, M.D., with Stone Mountain Health Services, complaining of pain in the abdomen, watery bowel movements, sore throat, and difficulty swallowing. The plaintiff was then referred and admitted to the hospital with acute tonsillitis and abdominal pain possible of Crohn's disease. (R. at 194.) By August 27, 2005, the plaintiff was "doing a lot better" and was discharged home. (*Id.*) On August 31, the plaintiff returned to Dr. Narayanan for a follow-up. It was noted that the plaintiff was under the care of Dr. Sullivan who was weaning her from the previously prescribed Asacol as her Crohn's disease became stable. (R. at 221.) Dr. Narayana instructed the plaintiff to continue current medications and noting the plaintiff's admission of a history of anxiety disorder, the physician referred her to licensed clinical social worker Crystal Burke for evaluation and assistance. (R. at 222.)

On September 15, 2005, the plaintiff had a behavioral health consultation with Burke. The plaintiff reported that she had recently separated from her spouse of ten years, and they had recently filed bankruptcy and lost their home. She reported feelings of being overwhelmed and frequent crying episodes, decreased energy, and panic attacks. The plaintiff stated that she often felt frightened and hopeless, but
- 7 -

denied any suicidal or homicidal ideations. Burke assessed that the plaintiff had multiple situational stressors and a depressed mood. Burke encouraged coping strategies, development of a support system, and relaxation techniques. (R. at 231.) The plaintiff attended a health follow-up with Burke on October 13, 1005. Between visits the plaintiff was again hospitalized for her Crohn's disease. (*Id*.)

The plaintiff did not return for a follow-up with Burke until December 13, 2005. (R. at 229.) She reported that she missed her last appointment due to another hospitalization for her colitis. (*Id*.) The plaintiff, although still separated, noted a decrease in some stressors concerning her financial situation. (*Id*.) The plaintiff also revealed to Burke that she had begun taking Lexapro, which was helping her "not to be as tearful and sad or obsessive on the negative and worry." (*Id*.) Burke noted upon this visit "some symptom alleviation" and allowed the plaintiff to discuss and vent frustrations for a support plan. (*Id*.)

On February 1, 2006, the plaintiff was admitted to Buchanan General Hospital with abdominal pain and vomiting and an upper GI examination was advised. (R. at 249.) A hernia with minimal inflammation of the esophagus and evidence of gastritis were found, and a biopsy was performed. The plaintiff was then discharged that evening. (*Id*.)

- 8 -

Case 1:07-cv-00073-JPJ-PMS   Document 20   Filed 10/02/08   Page 8 of 18   Pageid#: 408

On February 9, 2006 the plaintiff then returned to Buchanan General Hospital with complaints of recurrent nausea, vomiting, diarrhea, and abdominal pain and she saw Jashbhai Patel, M.D. A flexible colonoscopy was performed. (R. at 238.) The colonoscopy proved that there were no mass lesions, ulceration, bleeding, and "no evidence of Crohn's disease or colitis." (R. at 240.) Limited activity and a regular diet were recommended and the plaintiff was discharged home the same day. (*Id*.)

Upon the request of her attorney, the plaintiff was examined by Brian Warren Ph.D., who performed a psychological evaluation on February 6, 2006. The plaintiff's chief complaints were her symptoms of Crohn's disease, depression, anxiety, and distress about her physical health . (R. at 257-258.) After the interview Dr. Warren reports that "there are no psychotic symptoms or unusual mental content," but the complete diagnosis consists of major depressive disorder, severe anxiety disorder, mild mental retardation, and Crohn's disease.[1] (*Id*.) Dr. Warren also presented a report on the plaintiff's mental capability in performing work-related activities. This report found the plaintiff only moderately impaired overall with marked impairments

---

[1] There is some discrepancy in Dr. Warren's diagnosis of a mild mental retardation. According to Dr. Schacht and independent of IQ scores, there was no evidence of mental retardation in the plaintiff's history. (R. at 333.) The plaintiff also testified that she did not participate in special education classes during high school (R. at 319), but noted to Dr. Warren that she did receive special education classes especially in reading. (R. at 256.) Taking into consideration Dr. Schacht's credentials, inconsistences in the medical record, and the plaintiff's inconsistent statements to Dr. Warren, the ALJ found Dr. Schacht's opinion to be credible and gave it the greatest weight in his decision. (R. at 17.)

concerning her ability to remember and carry out detailed instructions, and marked impairments of her social and public skills. (R. at 261-263.)

On June 4, 2006 the plaintiff returned to see Burke for a behavioral health follow-up. Burke assessed the plaintiff as continuing to exhibit some anxiety and depression with particular concern for her daughter. (R. at 270.) During this time the plaintiff continued her visits and follow-ups to Stone Mountain Health Services. (R. at 266-280.)

After an appendectomy on August 6 2006, the plaintiff transferred from Buchanan General Hospital and was admitted to Bristol Regional Medical Center on August 13, 2006. (R. at 287.) While at Bristol Regional the plaintiff received a CT scan of her abdomen and pelvis revealing inflammatory changes. The diagnoses were Crohn's ileitis, elevated blood glucose levels due to steroids, and leukocytosis. (R. at 285.) She was then given medications and discharged home. (*Id*.)

A VE also testified at the hearing. (R. at 334-39.) The ALJ asked the vocational expert to consider various hypothetical situations, including whether jobs existed in significant numbers for an individual the same age as the plaintiff, with her same education and background, who was restricted to light work activity. The ALJ described light work activity as lifting and carrying, including upward pulling, up to twenty pounds occasionally and ten pounds frequently; sitting, standing and walking

with normal breaks for about six hours in an eight-hour day; and pulling and pushing without restriction. (*Id*.) In response the VE testified that such an individual as the plaintiff could perform jobs as an interviewer, a library or record clerk, a food preparer, and a janitor. (R. at 335.) The VE further noted that there were approximately 114,000 such jobs within the region of the plaintiff's residence and 8.9 million in the national economy. (*Id*.)

III

The plaintiff's primary argument on appeal is that the ALJ's decision that the plaintiff retained the residual functional capacity for light work is not supported by substantial evidence given the medical opinion. The plaintiff further argues that remand is necessary pursuant to the sixth sentence of 42 U.S.C.A. § 405(g), in light of the plaintiff's submission of new evidence.

The plaintiff bears the burden of proving that she is under a disability. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). The standard for disability is strict. The plaintiff must show that her "physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of

substantial gainful work which exists in the national economy . . . ." 42 U.S.C.A. § 423 (d)(2)(A).

The Commissioner applies a five-step sequential evaluation process in assessing SSI claims. The Commissioner considers whether the claimant (1) has worked during the alleged period of disability; (2) has a severe impairment; (3) has a condition that meets or equals the severity of a listed impairment; (4) could return to her past relevant work; and (5) if not, whether she could perform other work present in the national economy. *See* 20 C.F.R. § 416.920(a)(4) (2007). If it is determined at any point in the five-step analysis that the claimant is not disabled, then the inquiry immediately ceases. *See id.*; *Bowen v. Yuckert*, 482 U.S. 137, 141-42 (1987).

My review is limited to a determination of whether there is substantial evidence to support the Commissioner's final decision and whether the correct legal standard has been applied. 42 U.S.C.A. § 405(g); *see Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). If substantial evidence exists, the final decision of the Commissioner must be affirmed. Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotations omitted). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws*, 368 F.2d at 642. It is the role of the ALJ to resolve evidentiary conflicts, including

inconsistences in the evidence. It is not the role of this court to substitute its judgment for that of the Commissioner, as long as substantial evidence provides a basis for the Commissioner's decisions. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).

The ALJ found that the plaintiff's Crohn's disease and gastritis were severe impairments, but that these did not meet or equal the severity of a listed impairment and the plaintiff could return to her past relevant work. (Pl. Br. Supp. Mot. Summ. J. 15.)

First, the plaintiff argues that the ALJ erred in determining that the plaintiff's Crohn's disease and gastritis "did not meet or equal one of the impairments listed in the Listing of Impairments as found in Appendix 1, Subpart P of Regulation No. 4." There, however, are insufficient findings on either examination or diagnostic test workup to confirm the presence of an impairment or combination of impairments which meets or equals the criteria of any impairment listed therein. (R. at 19.) The evidence suggests that the plaintiff responds well to treatment for her impairments and shows symptom alleviation. (R. at 139, 229.) Thus, considering the "severity and duration of these disorders within the context of prescribed treatment," the plaintiff's Crohn's disease and gastritis do not meet or equal the impairments listed. 20 CFR § 404.920(b) (2007).

The plaintiff next argues that in finding that she had the residual functional capacity to work at the light exertion level and could return to her past relevant work the ALJ "abused his discretion in discrediting the medical opinions offered by the physicians who actually examined her" (Pl's Br. Supp. Mot. Summ. J.. 15-16.) According to 20 C.F.R. § 416.927(a) (2007) "a medical opinion is a statement from an acceptable medical source that reflects a 'judgement' about the nature and severity of the individual's impairment(s) and her resulting limitations" (Def.'s Br. Supp. Mot. Summ. J. 10.). The ALJ did not err but reviewed the medical opinion according to the criteria mandated in § 416.927, when he assessed the plaintiff's residual functional capacity. The ALJ did not only consider whether or not the plaintiff was examined by the medical professionals giving the opinion, but he also considered whether or not the medical opinion was supported by relevant evidence and the supportablility and consistency of the medical opinion. (*Id*. at 11.)

Although the plaintiff's Crohn's disease and gastritis are severe, the ALJ was supported by substantive evidence in his finding that she had the residual functional capacity to return to past relevant work. In the evidence the plaintiff noted to Dr. Sullivan that the "only time that she seems to have a little bit of a flare with her Crohn's disease is around the time of her menses." (R. at 126.), and she responds "quite well" to prednisone injections and other medications for Crohn's disease. (R.

at 139.)  When seen on August 17, 2004, the plaintiff also reported to Dr. Sullivan that she "has had no flare-ups until this month," and as of that date she had not been seen since February.  (R. at 131.)  Dr. Sullivan had also taken the plaintiff off the medication for her symptoms as her Crohn's disease stabilized.  (R. at 221.)  The evidence in this case establishes that the claimant does have severe Crohn's disease and gastritis, but that her symptoms are under control.

It must be noted that no treating physician had placed any physical restrictions on the plaintiff or indicated that she was totally disabled. (R. at 122, 126-67, 192-203, 205-55, 266-310, 312.)  The plaintiff argues to the contrary.  In her brief she cites a statement made by Dr. Narayanan who had written that he was of the "opinion" that the plaintiff "is unable to continue working especially because of the fact that she can never predict as to when her Crohn's disease and diarrhea can explode."  (R. at 221.) However, in his report it is evident that Dr. Naryanan is quoting the plaintiff's history of her symptoms and illness and not expressing his personal opinion or judgment.  Dr. Narayanan writes, "She states that if she is able to get one week of work in a month that it would be her normal."  (*Id*.)  This confirms that the doctor is not relaying a personal judgement, but writing down his patient's personal history.

Furthermore, the plaintiff argues that she is limited by her severe mental impairments of anxiety and depression.  While the plaintiff alleges disability due to

anxiety and depression, the ALJ found that these symptoms had "not resulted in more than minimal ongoing limitations for any twelve consecutive months." (R. at 16.) The plaintiff reported a history of anxiety disorder when seen at Stone Mountain Health Services on August 31, 2005. (R. at 222.) There is, however, no evidence of any mental problems before this date (R. at 122-195), and in Dr. Patel's evaluation of the plaintiff on August 25, 2005, he notes that she "has no anxiety, no stress, no insomnia, no nervousness and no depression." (R. at 196.)

The plaintiff contends that clinical social worker Burke revealed that the plaintiff's thought processes was evidence of psychoses (R. at 231), but in the plaintiff's psychological evaluation with Dr. Warren, a licensed clinical psychologist, he notes that "there are no psychotic symptoms or unusual mental content." (R. at 257.) Although Wood may have been dealing with a mild depression, it is evident that her depression was due to her immediate environmental stressors such as her financial situation, her separation from her husband, and her symptoms of Crohn's disease. (R. at 231.) This was not a long term impairment, and it is evident that the functional limitations stemming from the plaintiff's depression were not disabling. *See Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986). It was also noted that the anti-depressant Lexapro was helping with symptom alleviation. (R. at 229.)

The plaintiff argues that the ALJ erred in discounting opinions of examining physicians. Overall, the ALJ decided not to give probative weight to Dr. Warren's opinion. As the Commissioner argues, the ALJ found the plaintiff was not truthful with Dr. Warren and Dr. Warren's assessment was based more on the plaintiff's subjective complaints rather than the objective evidence of the record. (R. at 17.) The plaintiff was untruthful with Dr. Warren about the extent of her anxiety and her educational history. (*Id.*)

The plaintiff also argues that the ALJ erred in rejecting the IQ testing performed by Dr. Warren. It is evident, however, that rather than focusing on her IQ scores the ALJ focused on the diagnosis of mental retardation, and the plaintiff does not have a history consistent with mental retardation. (*Id.*) I therefore find no error in the ALJ's decision not to give Dr. Warren's opinion probative weight.

The plaintiff asserts that her case should also be remanded pursuant to the sixth sentence of § 405 (g), given her submission of additional evidence to the court. (Pl.'s Br. at 17-19.) The additional evidence includes the plaintiff's school records, a statement from Burke, and a letter from Dr. Hays. Remand is not warranted because this evidence is not material to the extent that the ALJ's decision "'might reasonably have been different'" had it been before him. *See Borders v. Heckler*, 777 F.2d 954, 955 (4th Cir. 1985).

To secure a remand, the individual must show that the newly discovered evidence "raises a 'reasonable possibility' of reversal sufficient to undermine confidence in the prior decision." *Newhouse v. Heckler*, 753 F.2d 283, 287 (3d Cir. 1985). The statutory requirement that evidence be "material" is a recognition that "not every discovery of new evidence, even if relevant and probative, will justify a remand" because "some evidence is of limited value and insufficient to justify the administrative costs and delay of a new hearing." *Chaney v. Schweiker*, 659 F.2d 676, 679 (5th Cir. 1981). The evidence at issue does not meet this test. The plaintiff's request for remand will be denied.

IV

For the foregoing reasons, the plaintiff's Motion for Summary Judgment will be denied, and the Commissioner's Motion for Summary Judgment will be granted. An appropriate final judgment will be entered affirming the Commissioner's final decision denying benefits.

DATED: October 2, 2008

/s/ JAMES P. JONES
Chief United States District Judge